IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    Crim. No. 04-60042-01-AA
                                                OPINION AND ORDER

            Plaintiff,

    vs.

DONALD WESLEY DEEKS,

            Defendant.

---

Karin J. Immergut
United States Attorney
District of Oregon
Stephen H. Gunnels
1100 N.W. Bond Street
Bend, Oregon 97701
    Attorneys for plaintiff

Shaun S. McCrea
McCrea, P.C.
1147 High Street
Eugene, Oregon 97401-3270
    Attorney for defendant

AIKEN, Judge:

    Defendant moves to suppress evidence.  The court held a

full-day hearing on November 3, 2005, where witnesses were called and exhibits admitted. The parties then filed written closing arguments with the court. Based on the record before this court, defendant's motion to suppress evidence is denied.

## BACKGROUND

Defendant is charged with: (1) Possession with Intent to Distribute Cocaine; and (2) Importation of Cocaine. 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii)(II), 952, 953, 957 and 960(a)(1), (b)(2)(B)(ii).

During the evening of May 10, 2003, Danelle Garza arrived at defendant's house located at 21425 Hyde Lane in Bend, Oregon. While there, Ms. Garza ingested cocaine. Soon after ingesting the drug, Garza started to convulse. The defendant called 911 and requested medical assistance. Defendant then carried Garza to his front porch and covered her with a blanket.

When the EMTs arrived, they found Garza laying unconscious on defendant's front porch. They began to perform CPR on her. Defendant retreated into his home. At approximately 11:35pm, Deputy Jefford of the Deschutes County Sheriff's Office arrived at defendant's home. At that same time, paramedics transported Garza to a Bend hospital where Garza was ultimately pronounced dead. After the paramedics left with Garza, Deputies Jefford and Bilyeu went to defendant's front door and rang his doorbell. The defendant answered the door, identified Garza and provided the

deputies with information about himself.

Deputy Jefford asked defendant what had happened. Defendant responded that he had known Garza for 20 years, and that they had lived together for approximately six months about 20 years ago. Garza arrived at defendant's home that evening by taxi approximately 1 ½ hours earlier. The defendant and Garza decided to leave his house to go out for more drinks. As they were leaving defendant's house, Garza collapsed on the front porch and began "snoring." The defendant attempted to "awaken" Garza for approximately ten minutes, and upon receiving no response, decided to call 911.

Deputy Bilyeu asked defendant where Garza had been sitting while in the house. The defendant said she had been sitting on the couch. Deputy Bilyeu then asked defendant if he would give them permission to go into the house and look at the couch as well as the area where Garza was sitting in order to see if there was anything in the area where Garza was sitting that could explain her medical emergency.

Deputy Jefford testified that the defendant gave permission for the deputies to enter the house to look at the area where Garza had been sitting by stepping back from the doorway, opening the door wide, throwing his arm towards the living room, and stating, "go ahead." Deputy Jefford testified that he and Deputy Bilyeu then entered the house and walked into a living

area which contained a couch, a matching chair, and a coffee
table situated in front of the couch.

Deputy Jefford testified that as he entered the living room,
he saw on the coffee table a silver spoon with a clear residue in
it, as well as a syringe cap. He also saw on the kitchen counter
two pieces of metal foil, each about 1 ½ inches wide by 3-4
inches long. Deputy Jefford testified that those items caused
him to suspect that illegal drug use had been occurring in the
house.

Deputy Jefford testified that Deputy Bilyeu then asked
defendant if he could look in the cupboard door and drawers of
the coffee table adjacent to the couch. The defendant asked the
deputies why they needed to look in those places. Deputy Bilyeu
told the defendant that he wanted to see if there was anything in
that area that might help explain why Garza collapsed.

Deputy Jefford testified that the defendant then provided
the deputies with verbal consent to search those locations.
Deputy Bilyeu began searching the coffee table drawers. In a
lower drawer, he found a blue dinner plate covered with a white
substance in both powder and rock form. Also on the plate were
the following items: a two to three inch "drinking" straw; a
razor blade; a glass pipe; a burnt piece of aluminum foil; and a
plastic credit card type card with the name of 'Don Deeks'
imprinted on it. When Deputy Bilyeu pulled the dinner plate out

he asked defendant what the substance was. Deputy Jefford
testified that the defendant got very excited and agitated at
that point; the defendant denied any knowledge of the plate and
of the substance on the plate. Deputy Jefford testified that he
then advised defendant of his Miranda rights by reading those
rights from a pre-printed card he carried in his pocket and asked
him if he understood those rights. The defendant replied that he
understood. Deputy Jefford testified that he then told the
defendant that it would be in defendant's best interest to be
"totally up front and honest" about the substance on the plate.

The defendant continued to deny any knowledge of the
substance. He said that he had been on vacation for several
weeks and that some friends had stayed at his house for part of
that time. The defendant then asked the deputies whose name was
on the credit card. The deputies replied that it was defendant's
name on the card. Deputy Jefford testified that the defendant
then attempted several times to approach the plate but was told
by the deputies to sit back down. At one point, the defendant
said the white substance "might be cocaine, but it's not mine."

Deputy Jefford testified that he then told the defendant he
was under arrest. Deputy Jefford testified that the defendant
resisted arrest, became very agitated, and was yelling and
screaming. Eventually, the defendant was physically subdued by
Deputy Jefford, handcuffed and placed under arrest. While the

defendant was being taken to a patrol car, Deputy Bilyeu remained in the home. After a few minutes, the deputies began a physical check of the rest of the house. Deputy Jefford testified that the deputies "cleared" the house to determine if there was anyone else in the home, due to concern for safety of others, as well as to ensure that no one tampered with or destroyed the evidence while a search warrant was sought. Deputy Jefford testified that they walked upstairs with their guns drawn. They went into the master bedroom, which included a bathroom and walk-in closet. Deputy Jefford testified that inside the walk-in closet he saw additional evidence of drug activity, specifically, syringes, propane torches and plates and serving spoons with what appeared to be drug residue on them. Deputy Jefford testified that they "cleared" the entire property, including defendant's garage. Upon determining that no one else was in the house or garage, the deputies then left the house and locked it.

Detective Garrison testified that he interviewed the defendant after the defendant had been transported to the Deschutes County Jail. After the interview, Garrison prepared an affidavit in support of a search warrant. That affidavit and an accompanying search warrant for defendant's home were presented to Deschutes County Judge Michael Sullivan on May 11, 2003. After reviewing those documents, Judge Sullivan signed the warrant authorizing a search of defendant's home. Sheriff's

deputies then searched defendant's home and found numerous items of evidence throughout the home, including approximately 3.6 pounds of cocaine.

## DISCUSSION

The defendant asserts the following: (1) the warrentless search of his home following his arrest violated the Fourth Amendment and was therefore illegal; (2) the search of his home pursuant to a warrant was illegal; (3) his statements to Detective Garrison made while he was in custody, and other statements he made at his home to police officers, should be suppressed because he "was so intoxicated and in such a state of mind as a result of that intoxication that the statements were not made knowingly and voluntarily and that any waiver of rights was not made knowingly or voluntarily;" and (4) the defendant did not give voluntary consent for the officers to enter his home initially, or to search the coffee table drawers. Defendant's Motion to Suppress, p. 2.

Regarding defendant's assertion that the warrantless search of his home was illegal, the government asserts that the warrantless search was "pursuant to arrest" and therefore authorized under the Fourth Amendment. I agree. The justification for such a search is the need to seize weapons or other items that endanger the officers' safety or which may allow the defendant to escape. Such a search is also allowed to

prevent the loss or destruction of evidence. United States v.
McConney 728 F.2d 1195, 1206-07 (9th Cir. 1984).

The defendant argues that the warrantless search of his home
cannot be justified as a search incident to arrest. Defendant
asserts that the search, particularly opening the walk-in closet
in defendant's bedroom, went "well beyond [defendant's] immediate
control." Therefore, the government's two stated justifications
for the search - searching for weapons or destructible evidence
within the immediate area of the defendant - are not present
here. Further, defendant asserts that there are no indications
from any of the police reports that anyone else was present in
the home who could have destroyed evidence.

Based on the officers' testimony and the facts adduced at
the hearing, I find that the officers' actions were reasonably
necessary to ensure that there was no one else in the home that
either posed a safety threat to the officers or who may have
destroyed evidence prior to the police returning with a search
warrant. The officers testified that they walked upstairs "with
their guns drawn" indicating that they were concerned about
finding someone else in the house. The officers also testified
that they searched the garage, an indication that they were
intent on accomplishing a comprehensive protective sweep of the
premises. Moreover, I find it reasonable that the officers
looked inside a walk-in closet in the master bedroom. The walk-

in closet was a room of sufficient size capable of hiding one or more persons, therefore, the deputies' action in opening that door is not like the police choosing to open dresser drawers or file cabinets.

Even if this portion of the search was found to be a violation of defendant's constitutional rights and thus inadmissible, which this court does not, the evidence found during the search warrant would still be admissible. If the challenged portion of the affidavit is excised, I find that it constituted an insignificant part of the affidavit given the totality of the circumstances as described in the remaining affidavit. The remaining portions of the affidavit demonstrate sufficient probable cause to believe that evidence of the crimes of delivery and possession of cocaine would be found within the defendant's home. See United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987).

The defendant next asserts that his statements to officers at his house were involuntary and therefore inadmissible due to his level of intoxication. The court's inquiry here is whether, given the totality of the circumstances, law enforcement officers obtained the evidence by "overbearing" defendant's will. Haynes v. Washington, 373 U.S. 503, 513-14 (1963). The inquiry must focus on: (1) the police officer's conduct in creating pressure; and (2) the defendant's capacity to resist that pressure. Mincey

v. Arizona, 437 U.S. 385, 399-401 (1978). The Supreme Court has held that coercion by a state actor is a necessary element in satisfying this test. Colorado v. Connelly, 479 U.S. 157, 170 (1986)(mentally ill defendant's confession to police officer was "voluntary" because no evidence of police coercion); Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995)(confession found voluntary despite defendant's intoxication on thorazine because no evidence of police coercion).

Deputy Jefford testified that he advised defendant of his Miranda rights in defendant's home and Detective Garrison testified that he advised defendant of his Miranda rights prior to each of the two recorded interviews. I find no evidence that the deputies coerced any statements from the defendant. Moreover, both of the tape recorded interviews reveal a low-key, respectful, and nonthreatening interview style by Detective Garrison. The interviews do not reveal any threats or promises of leniency by Detective Garrison. I find no evidence that defendant's statements, either at his home or at the police station, were elicited through coercion or improper police conduct. Defendant was advised of his Miranda rights at least four times in two days, the defendant acknowledged those rights and chose to speak with police each time. Given the totality of the circumstances, I find that the officers did not overbear the defendant's will either when talking with the defendant in his

home or during either of the two recorded interviews at the police station.

Finally, I note that defendant has offered no case law in support of his position that intoxication - by itself (without coercion) - invalidates a defendant's admissions and/or statements to law enforcement officers. Therefore, I find that defendant's statements to law enforcement officers occurring both at his house (pre and post custody) and during the two audio taped interviews that occurred May 11, 2003 while defendant was in custody at the Deschutes County Jail were voluntary and admissible.

## CONCLUSION

Defendant's motions to suppress evidence (doc. 38, 39) are denied.

IT IS SO ORDERED.

Dated this _6_ day of December 2005.


_____
                    Ann Aiken
          United States District Judge